[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On or about January 26, in Danbury in the Tortilla Flats Restaurant, Dominick Badaracco was shot and killed. The shooting appears to have been generated by a physical confrontation between a Susan Bruemmer and the decedent in which she threw a glass of wine on him. Shortly thereafter, the defendant and the decedent became involved in a physical scuffle. In the course of the scuffle, the parties fell to the floor, the defendant actually struck a radiator bruising his back slightly. He received a bloody nose as a result of the encounter. As he was fairing poorly in the battle, he drew his weapon, for which he had a permit, and placed it against the decedent's neck. They separated or were separated, and the defendant left the immediate area and went into the kitchen. After a few moments, the decedent followed the defendant into the kitchen. The decedent advanced upon the defendant who drew his gun. He claimed to have warned the decedent and when the decedent continued to advance toward him, he emptied the clip in the weapon into the body of the decedent, killing him.
Three officers from the Police Department of the City of Danbury arrived at the scene, and after some preliminary efforts, found the defendant in the kitchen with the lady who became involved in the confrontation with the decedent. They were standing in the corner of the kitchen and the defendant had paper towels in his hand. The decedent was on the floor of the kitchen with someone who is yet to be identified bending over him. The defendant was duly ordered to drop the towels, to fall on his knees and place his hands over his head, which he did after being directed to so do several times. He was handcuffed and taken into custody and taken outside the restaurant to a police car operated by an Officer Bishop of the Danbury Police Department. He was placed in the back seat of that patrol car.
Officer Bishop had no Advisement of Rights forms in his CT Page 2343 vehicle and another officer went to a second vehicle where one was retrieved. It was given to Officer Lalli who proceeded to advise the defendant of his rights in Bishop's presence with the defendant remaining in Bishop's car with the window partially opened. The form itself was never executed with respect to the signatures or the time of the advisory.
According to the testimony of the police officers, the defendant acknowledged his rights, that he understood them, and at that time did not attempt to invoke them. During the ride to the Danbury Police Department, a distance of between two or three miles, the defendant made unsolicited comments about the shooting and about his Marine Corps service, where he claims to have been a Marine Lieutenant and who as a Marine was taught to empty the clip in his weapon whenever he pulled the trigger.
Upon arrival at the Danbury Police Department, the defendant is described as having a swollen bloodied nose which had apparently stopped bleeding, blood on his jacket, on his shirt and on his pants. He also had some bruise marks on his back, apparently from the contact with the radiator. The blood on his clothing apparently came from his nose. He was asked if his nose was broken and he responded in the negative. He was asked if he desired medical attention and he refused.
Within the first twelve (12) or thirteen (13) minutes after the defendant's arrival at the Danbury Police Department, he answered questions calmly and apparently intelligently about his motor vehicle, that is the model, the year and the location of his registration. He gave his address. At the end of that time span, the question was asked, "When does my lawyer come down here?" Officer Bishop responded, "When you decide, when you make the call." The defendant did not request the opportunity to make such a call.
The defendant was handcuffed to a bench in the holding area of the police department and within a few feet from him at a desk sat Officer Rachel Nolan, who was in the process of writing a police report on an unrelated incident. After the defendant's question about the lawyer was answered, Officer Nolan said to him, "Don't say anything, all right." He thereafter proceeded to ask her to shut off the fan and then said within a matter of seconds, "I holstered it." The use of these words in their plain, common and ordinarily understood meaning refers to the act of placing a firearm in a receptacle which is designed to hold it. CT Page 2344
This is the only mention of a lawyer prior to and during the proceedings in the police department that evening. The defendant in his cross-examination of the police officers makes reference to a second question about a lawyer. The testimony, however, and the tape of his detention which was viewed by the court, discloses absolutely no mention whatsoever of a second statement about an attorney. At 2:20 in the morning, the defendant was formally advised of his rights, formally in the sense of executing the judicial Notice of Rights form. The signature appears on the form and there is no invocation of his right to counsel. An hour later, he is again advised of his rights, and expressly waived those rights. His written statement was taken by the police beginning at 3:40 in the morning and finishing at 4:10 in the morning. At 5:16, he made his first call to his girlfriend to request clothing and NOT (emphasis supplied) an attorney. He made a second call some thirteen (13) or fourteen (14) minutes later, calling his sister, and again made a request for clothing for court, but NOT (emphasis supplied) for an attorney. This facet of the motion to suppress raises the issue of the defendant's right to counsel and whether or not there was an invocation of that right. The second salvo of the motion to suppress addresses the waiver of the defendant's rights underMiranda upon the proper advisement of those rights.
Whenever an accused person exercises his right to counsel, the interrogating police must terminate any interrogation at that point, unless and until the accused executes, or by conduct, establishes a valid waiver of a request for counsel. See State v.Anderson, 209 Conn. 622, 626-27 (1989). This rule becomes effective, however, only when the accused person has made an unambiguous and unequivocal request for counsel. Lord v.Duckworth, 29 F.3d 1216, 1220; State v. Anderson, supra; Statev. LaPointe, 237 Conn. 694, 716 n. 27 (1996).
Whenever a question is raised as to whether or not an accused person actually requested counsel, a factual inquiry is required to determine whether he attempted to invoke a present right to counsel and whether his asserted request was unambiguous and unequivocal. The request requires at a minimum some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney in dealing with the custodial interrogation by the police. McNeil v. Wisconsin,111 S.Ct. 2204, 2209. That determination is an objective determination. It avoids problems with proof and provides a bright line for the CT Page 2345 police to follow. The Supreme Court has observed that the statement is either such an assertion of the right to counsel or it is not. Davis v. United States, 512 U.S. 452, 459.
Interestingly enough, Davis refused to adopt the rule requiring the police to ask clarifying questions of an accused person where an ambiguous or equivocal request is made. Our own Supreme Court followed Davis in State v. LaPointe, supra, 716 n. 27, citing that case as a matter of federal constitutional law.Davis supercedes cases such an State v. Acquin, 187 Conn. 647,674, and Anderson, which hold that following an ambiguous request for counsel, the only question the police may ask are those aimed at clarifying whether the accused had invoked that right. SeeAnderson, supra, 628; Acquin, supra; and State v. Pannetti,891 S.W.2d 281, 284 (Tex.App. 1995) duty to clarify rule abandoned by Davis. Whether the words utilized by an accused person in custody amount to an invocation of counsel is a question of law as also worthy of de novo review. The words utilized are reviewed as to whether "ordinary people" would understand that the accused is invoking his right to counsel. Connecticut v. Barrett,479 U.S. 529, 107 S.Ct. 832.
Under these rubrics, the court will examine the defendant's statement: "When does my lawyer come down here?" The statement is clearly expressed as a question. In and of itself, it does not remotely suggest a request for counsel. The officer's response of "when you decide when you make the call," answers that question. There was no request for such call. Since a reviewing court must determine whether the accused has made an unequivocal request by a clear demand for an attorney, such a request requires an examination of the facts and circumstances surrounding the defendant's statement. The fact that the defendant did not make the call after Officer Bishop's response to his question, suggests indeed, and convinces this court, that his question was in the nature of procedural question.
It must also be remembered that the accused had been previously advised of his rights while seated in the back seat of Officer Bishop's police cruiser. The fact that there is no formally executed rights form in no way overcomes this finding by this court; i.e., that he was indeed advised of his rights. The significance of any failure to formally execute the so-called form, to require the defendant to initial each right, to log the time to require him to sign it, and to forward a copy to the clerk's office is of no constitutional moment, but merely creates CT Page 2346 a vehicle by which it may well be easier to prove that the advisory was given and the waiver of rights did occur. Cross-examination by the defense produced no testimony and no evidence to contradict the officer's testimony. This court has no option under the circumstances but to accept it as true, based upon its observations of the witnesses and its assessment of credibility of the witnesses who testified to those facts.
Some examples of ambiguous or equivocal attempts to invoke the right to counsel can be found in several cases on the subject. "How long would it take if I want to get a lawyer and would I have to stay in jail while I wait for a lawyer?" UnitedStates v. Lux, 905 F.2d 1379, 1382 (10th Cir. 1990). "I UnitedStates v. Scarpa, 897 F.2d 63, 66 (2d Cir.), cert. denied,498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). "Should I call my lawyer?" United States v. de la Jara, 973 F.2d 746, 751 (9th Cir. 1992). "I can't afford a lawyer but is there any way I can get one?" Lord v. Duckworth, supra, 29 F.3d at 1220-21. "Officer, what do you think about whether I should get a lawyer?"Towne v. Dugger, 899 F.2d 1104, 1107, 1110 (11th Cir.), cert. denied, 498 U.S. 991, 111 S.Ct. 536, 112 S.Ct. 546 (1990). "Maybe I should call my attorney?" Robtoy v. Kinchloe,871 F.2d 1478, 1479 (9th Cir.) (1989), cert. denied, 491 U.S. 1031,110 S.Ct. 1483, 108 L.Ed.2d 619 (1990). "Could I call my lawyer?"State v. Wilkenson, 861 S.W.2d 746 (Mo.App. ) 1993, is perhaps closest to the situation in the instant case. However, Wilkenson
was given the opportunity to call but did not exercise that opportunity. "Does that mean I can have a lawyer and it won't cost me any money?" Donovan v. State, 400 So.2d 1306 (Fla.App. 1981).
When compared to those examples, the language "when does my attorney come down here" falls four square within the interpretation that the accused in this case, as well as the defendants cited in the foregoing cases, did not clearly, unequivocally and unambiguously invoke their right to counsel.
The defendant relies on the court's comment in State v.Anonymous, 240 Conn. 708, that when faced with ambiguous and equivocal references to an attorney, clarifying questions would be "good police practice." That comment gratuitous as it is, does not expand Davis as expressing the minimum federal standard. The argument that utilizing the Connecticut Constitution which has often been said to afford criminal defendants greater protection than the Federal Constitution does not persuade this court. If CT Page 2347 our Constitution does in fact sustain the defendant's posture herein, it then is left to our Appellate Courts to do so.
To reiterate, the accused must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. Davis v. United States, 512 U.S. 452,459, citing therein Edwards v. Arizona, 451 U.S. 477.
The defendant's arguments against a waiver of his rights ignores several cogent considerations. He was advised of his rights early on in the police cruiser, at the police station and again before his statement was taken. He uttered spontaneous declarations on several occasions. He was told by Officer Nolan, after being told he was under arrest, "Don't say anything alright" [sic]. He then said within a span of two minutes that ". . . I holstered it." Approximately thirty-five minutes later he said, "Really didn't want to shoot anybody. . . . I feel bad for him, he's not coming back."
Before his statement was taken, he formally executed a written waiver acknowledging each of rights and initialing each. He signed the waiver form. The form was read to him and by him before he initialed or signed it. His conduct and physical condition do not suggest that he was confused, badgered or lead. He declined medical attention. There is no evidence to suggest that he was ignorant, confused, significantly injured or cornered into the oral statements he made or the written statement he executed. Argument is not a substitute for credible evidence. It is, indeed, in the nature of shadows and certainly not substance. There simply is no reason for the court to reject the testimony it heard. It finds that the defendant did not in fact invoke his right to counsel as aforesaid or that his statements, both those spontaneous and those formally written declarations, and were anything but an intelligent and voluntary relinquishment of his known rights.
The motion is, accordingly, denied.
Moraghan, J. CT Page 2348